IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────

SAMUEL CABASSA,

                    Plaintiff,

        v.                                      Civil Action No.
                                                9:06-CV-0852 (DNH/DEP)
JOSEPH SMITH, *et al.*,

                    Defendants.

─────────────────────────────────────

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

SAMUEL CABASSA, *pro se*
84-A-0364
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ANDREW M. CUOMO                  C. HARRIS DAGUE, ESQ.
Attorney General of the State        Assistant Attorney General
  of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Samuel Cabassa, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action against the superintendent of the facility in which he was incarcerated at the relevant times and various other employees of the New York State Department of Correctional Services ("DOCS"), pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.  In his complaint plaintiff alleges that defendants were deliberately indifferent toward, and failed to accommodate, several medical conditions including shoulder pain, an abdominal hernia, arthritis, a right knee injury, and a detached retina, and asserts claims under the Eighth Amendment to the United States Constitution as well as the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 120101 *et seq.* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  As relief, plaintiff's complaint seeks recovery of compensatory and punitive damages for his alleged mistreatment.

Currently pending before the court is defendants' motion for summary judgment dismissing plaintiff's complaint, both as lacking in merit and based upon qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted except as to

plaintiff's claims under the ADA and section 504 of the Rehabilitation Act against defendants in their official capacities.

I.    BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the DOCS as a result of a conviction for attempted murder, criminal use of a firearm, attempted assault, and weapons possession.  Defendants' Local Rule 7.1(a)(3) Statement of Material Facts (Dkt. No. 41-3) ¶ 3.  At all times relevant to his claims, plaintiff was designated to the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. *Id. ¶ 1; see also* Complaint (Dkt. No. 1) ¶ 2.

Plaintiff's claims in this action center upon defendants' diagnosis and treatment of five medical conditions identified in his complaint.   A review of the record now before the court confirms that over time plaintiff voiced complaints about each of these conditions, and discloses various efforts by defendants and other health care providers, both within the DOCS and on the part of outside consultants, to address plaintiff's

_____

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

conditions.[2]

Plaintiff contends that between April of 2000 and April, 2006, he complained "on approximately thirty separate occasions" to defendants Dr. Forte and Dr. Genovese that he was experiencing severe pain in his left shoulder, but that despite his complaints no action was taken, aside from the scheduling of magnetic resonance imaging ("MRI") testing on one instance and some physical therapy.  Complaint (Dkt. No. 1) ¶ 6(1). Plaintiff also alleges that between November, 2000, and March of 2004 his fourteen separate complaints of abdominal pain due to a hernia were similarly disregarded.  Complaint (Dkt. No. 1) ¶ 6(2).   He likewise maintains that between August of 2001 and July, 2003, he suffered "serious degenerative arthritis" which was not properly medicated. Complaint (Dkt. No. 1) ¶ 6(3).  The focus of plaintiff's complaints regarding Dr. Forte's treatment of his arthritis appears to be his alleged failure to provide plaintiff requested medication to relieve pain in his shoulders, hips, knees and lower back between August 24, 2001 and July 10, 2003 . *Id.*

Plaintiff also complains of defendants' treatment of his right knee,

---

[2]     The specifics of defendants' care and treatment of the defendants' various medical conditions will be detailed later in this report.  *See* pp. 17-24, *post.*

4

asserting that between August 21, 2001 and April of 2003 he was denied an appointment with an outside specialist, and that as a result the diagnosis of his knee condition as a torn meniscus, partial ligament and horizontal cleavage tear, and corresponding arthroscopic surgery in January of 2006 to repair that damage, were delayed.  Complaint (Dkt. No. 1) ¶ 6(4).  Lastly, plaintiff, who is blind in his left eye, asserts that defendants failed to provide him with proper care and treatment for distorted vision in his right eye from March of 2003 until October of 2004, additionally alleging that he was denied the use of a contact lens for his right eye on two separate occasions.  Complaint (Dkt. No. 1) ¶¶ 6(5)-6(7).

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on July 13, 2006.  Dkt. No. 1.  As defendants, plaintiff's complaint names Joseph T. Smith, the superintendent of Shawangunk; Dr. Anthony J. Forte, a former prison doctor at the facility who is now deceased; Dr. Lester N. Wright, the DOCS chief medical officer; Leonardo Portuondo, the previous superintendent at Shawangunk; Dr. Maryann Genovese, a physician employed at the facility; Dr. Richard Wurzel, allegedly employed as an optometrist at Shawangunk; and Thomas G. Eagen, the director of the

5

DOCS Inmate Grievance Program.  *Id.*  Plaintiff's complaint asserts that defendants were deliberately indifferent to his five specified medical conditions and failed to properly investigate his grievances regarding the matters, all in violation of his rights as secured by the Eighth Amendment and under the ADA and section 504 of the Rehabilitation Act.

On November 25, 2008, following the close of discovery, defendants moved for summary judgment dismissing plaintiff's complaint.  Dkt. No. 41.  In their motion, defendants argue that 1) plaintiff's suit against them in their official capacities is precluded under the Eleventh Amendment; 2) based upon the record before the court, no reasonable factfinder could conclude that plaintiff received constitutionally deficient medical care while at Shawangunk; 3) plaintiff's claims against them under the ADA and Rehabilitation Act, as individuals, are precluded; and 4) in any event, they are entitled to qualified immunity from suit.  *Id.*

Plaintiff's response to defendants' motion was initially due on December 19, 2008.  Dkt. No. 41.  That deadline, however, was later extended, and plaintiff was directed to file a response to the motion on or before January 16, 2009.  *See* Dkt. No. 48.  Despite the extension of the deadline plaintiff, an experienced litigator, did not respond in opposition to

the motion until June 29, 2009, forwarding with his significantly delinquent

submission a declaration offering justification for the late filing.[3]  Dkt. No.

49.   In deference to plaintiff's *pro se* status, notwithstanding its lateness, I

have considered plaintiff's submission in opposition to defendants' motion,

and recommend that the assigned district judge do the same.

Defendants' motion, which is now ripe for determination, has been

referred to me for a report and recommendation, pursuant to 28 U.S.C. §

636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See*

Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

---

[3]      Plaintiff has filed several other suits in this and other courts, including: *Cabassa v. Gummerson, et. al.*, 01-cv-010309, *Cabassa v. Smith, et. al.*, 08-cv-0480, *Cabassa v. Coughlin, et. al.*, 92-cv-6199, and *Cabassa v. Rufat, et. al.*, 96-cv-6280.  This is not the first instance that plaintiff has demonstrated what could be viewed as disinterest in pursuing his claim.  Despite the issuance of a court order permitting the defendants to take his deposition, on the scheduled date of deposition plaintiff refused to appear and participate in the process.  *See* Dkt. No. 27.  This notwithstanding, defendants do not hinge their motion for summary judgment on that unjustified refusal.

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A moving party bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*,

8

477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.

Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when

defending against summary judgment motions, they must establish more

than mere "metaphysical doubt as to the material facts."  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348,

1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21

(2d Cir. 1999) (noting obligation of court to consider whether *pro se*

plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party.  *See Building*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

B.    <u>Defendants' Eleventh Amendment Immunity to Plaintiff's</u>
      <u>Section 1983 Claims</u>

9

In their motion, defendants first challenge plaintiff's claims against them in their official capacities.  Defendants contend that as state employees they are immune from suit in their official capacities and, not having waived this immunity, therefore cannot be sued in their capacity as state employees.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).  This absolute immunity, which states enjoy under the Eleventh Amendment, extends to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[4] *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his official capacity, the official is entitled to

---

[4]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.  As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

invoke the Eleventh Amendment immunity belonging to the state.

*Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 3105 (1985);

*see also Hafer v. Melo*, 502 U.S. 21, 26, 112 S. Ct. 358, 361 (1991).

Eleventh Amendment immunity is by no means absolute as a bar

prohibiting suits against state employees, including under 42 U.S.C. §

1983.  It is clear that even though the Eleventh Amendment precludes

suits for damages against the states, state officials can be sued in their

individual capacities under section 1983 for monetary damages. *Hafer*,

502 U.S. at 30-31, 112 S. Ct. at 364-65 (holding that "the Eleventh

Amendment does not erect a barrier against suits to impose "individual

and personal liability on state officials under section 1983.") (quoting

*Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S. Ct. 1683, 1687 (1974),

*abrogated by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982)).

In light of these well established guiding principles, I recommend

that defendants' motion for summary judgment dismissing plaintiff's Eighth

Amendment claims be granted insofar as they are asserted against the

defendants in their official capacities.[5]

---

[5]        As was previously noted, in addition to his assertion of Eighth
Amendment deliberate indifference claims plaintiff also brings suit against defendants
under Title II of the ADA and section 504 of the Rehabilitation Act. Applicability of
these legal provisions and their implications in relation to defendants' official and

11

C.      Merits of Plaintiff's Deliberate Indifference Claims

Plaintiff's claims in this action center upon treatment provided by various prison officials for his medical needs, including injuries to his left shoulder, an abdominal hernia, degenerative arthritis, knee pain, and a detached retina in his right eye. Plaintiff claims that despite reporting all of these conditions to the proper medical personnel, he was forced to wait for unreasonably lengthy periods of time before drawing any medical attention.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id*.; *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia*, *Estelle*). While the Eighth Amendment does not mandate comfortable prisons, neither

--------------------

individual capacity liability will be discussed later in this report. *See* pp. 24-34, *post.*

does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain*, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 & 298, 111 S. Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also*, *generally*, *Wilson*, 501 U.S. 294, 111 S. Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp.2d at 546 (*citing Farmer*, 511 U.S. at 837,

13

114 S. Ct. at 1970); *Waldo*, 1998 WL 713809, at *2 (*citing Farmer*, 511 U.S. at 837, 114 S. Ct. at 1970).

        1.     <u>Serious Medical Need</u>

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'". *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*, 143 F.3d at 702).  Relevant factors informing this determination include whether the plaintiff suffers from an injury that a

"'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance*, 143 F.3d at 701 (citation omitted); *LaFave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

From the record now before the court, there is some doubt as to whether plaintiff can make the required, threshold showing that one or more of the medical conditions at issue presented a serious medical need, in a constitutional sense. Nonetheless, defendants have apparently accepted at least for purposes of their motion, that plaintiff can make this required showing and instead have focused on the deliberate indifference prong of the governing deliberate indifference standard.

### 2.   Deliberate Indifference

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach*, 103 F. Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979); *Waldo*, 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted).

A careful review of the record now before the court reveals that plaintiff has failed to substantiate his claims of deliberate indifference. In his complaint plaintiff sets forth a single paragraph summarizing his claims with regard to each of the medical conditions at issue. It appears that the gravamen of plaintiff's complaint is delay in addressing his concerns

16

regarding his medical conditions, including delay in providing outside consultation, rather than outright refusal to provide treatment.  This critical distinction is supported by plaintiff's medical records, which disclose extensive efforts on the part of prison medical personnel to diagnose and treat his various conditions and to provide him with necessary treatment and pain medication.  Having carefully reviewed the evidence before the court, including plaintiff's medical records and defendants' supporting affidavit of Dr. Maryann Genovese (Dkt. No. 41-7), a prison doctor and the Health Service Director at Shawangunk, I recommend a finding that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical conditions.

a)   <u>Left Shoulder</u>

Defendants' efforts to address plaintiff's complaints of left shoulder pain were extensive.  The record discloses that while incarcerated at the Auburn Correctional  Facility, prior to his arrival at Shawangunk, plaintiff's left shoulder was x-rayed leading to a diagnosis of peritendinitis, a condition involving inflamation of the sheath of a tendon, for which a non-steroidal anti-inflammatory drug ("NSAID"), Naprosyn, was prescribed. Genovese Aff. (Dkt. No. 41-7) ¶ 8.  The peritendinitis diagnosis was

confirmed upon plaintiff's arrival at Shawangunk by Dr. Anthony Forte, a defendant in the action, and Cabassa was continued on an NSAID, although Dr. Forte prescribed Celebrex instead of Naprosyn.  *Id.* ¶ 10.

While at Shawangunk, plaintiff received extensive care and treatment for his left shoulder condition.  Several x-rays were taken, an MRI of plaintiff's shoulder was ordered for diagnostic purposes, and a regimen of physical therapy was prescribed.  *Id.*  ¶¶ 8, 15, 17, 31.  Plaintiff was seen by specialists, including outside orthopedists and physical therapists, on several occasions, and was examined by medical staff at Shawangunk over fifty times.  *Id.* ¶¶ 10-11, 13, 15, 18, 21-22, 30, 34 and Exhs. 1-8.  In July of 2006 an outside orthopedist recommended arthroscopic surgery on plaintiff's left shoulder.  *Id.* ¶ 33.  Although plaintiff initially opted against the recommended surgery, he later relented and surgery was performed on November 30, 2006.  *Id.* ¶¶ 33-37.  Over time, plaintiff was prescribed various muscle relaxants and pain medications for his shoulder, including Naprosyn, Celebrex, Flexeril, Ultram, Tylenol #3, and Feldene.  *Id.* ¶¶ 10, 15, 19-20 and Exhs. 1-8.  *Id.*  Nowhere in plaintiff's medical records or his opposing affidavit is there any indication that defendants were indifferent to plaintiff's shoulder condition, or that

their delay in ultimately ordering surgery for the condition subjected him to a substantial risk of serious harm.

b)      Abdominal Hernia

Plaintiff claims that he complained of a hernia on fourteen occasions between November of 2000 and March, 2004, to no avail.  It is true that plaintiff voiced complaints of a stomach ailment, as well as hemorrhoids, as early as March of 2001.  Plaintiff was examined on several occasions between then and March of 2004 for the presence of a hernia, each time having been diagnosed with indigestion, constipation, or some other digestive condition.  *See* Genovese Aff. (Dkt. No. 41-7) ¶¶ 41-43 and Exhs. 2, 3.  During that time period plaintiff's digestive difficulties were treated with various medications including Prevacid, antacid tablets, Metamucil and sitz baths for his hemorrhoids.  *Id.* ¶¶ 41, 43.

Plaintiff was diagnosed as suffering from a ventral hernia on March 3, 2004.  Genovese Aff. (Dkt. No. 41-7) ¶ 44.  Plaintiff was seen by a gastric specialist on April 5, 2004, and within two months underwent successful surgery to repair the hernia.  *Id.* ¶¶ 45-46.

Plaintiff's contention apparently is that the hernia ultimately discovered in 2004 was present from the time of his initial complaints of

19

abdominal discomfort.  The record now before the court, however, does

not support that contention.  Nonetheless, even assuming for the sake of

argument that the hernia existed in 2001 but plaintiff's condition was mis-

diagnosed, such an allegation raises a claim of negligence or malpractice,

at best, which is not cognizable under section 1983.  *Estelle*, 429 U.S. at

105-106 and n.14, 97 S. Ct. at 292 and n.14.  Notwithstanding whether

they correctly diagnosed plaintiff's abdominal complaints, the record

reflects that defendants were in fact responsive to plaintiff's claims of

abdominal discomfort.

c)    <u>Degenerative Arthritis</u>

Without suggesting an alternative course that should have been

pursued by defendants to address his arthritis, a chronic condition, plaintiff

complains of the treatment received for this ailment.  His dissatisfaction

appears to be focused on the failure of prison officials to provide him with

desired pain medications, including between August 24, 2001 and July 10,

2003.  *See* Complaint (Dkt. No. 1) ¶ 6(3).  The record, however, belies this

claim.  Plaintiff's complaints of chronic pain were met with a series of back

and knee x-rays, MRI tests, and examinations by physicians and outside

consultants, all with an eye toward diagnosing and treating his arthritis.

Genovese Aff. (Dkt. No. 41-7) ¶¶ 53-55, 60 and Exhs. 3, 4.  In addition, plaintiff was treated through physical therapy and pain medication.  During the time that plaintiff contends he was denied adequate pain medication for his arthritis, his records reveal that he was prescribed analgesic balm, Flexeril, Ultram, Tylenol III, and Feldine.  *Id.* ¶ 62.  In short, the record fails to contain any evidence from which a reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's degenerative arthritis.

d)   <u>Right Knee Pain</u>

Plaintiff contends that he suffered right knee pain beginning in August of 2001, and that, despite ongoing complaints, he was not referred to an orthopedist until April 2003, and did not undergo MRI testing of his knee until December, 2005.  Complaint (Dkt. No. 1) ¶ 6(4).

Plaintiff's medical records reveal that his first complaint of right knee pain appears on August 21, 2001.  Genovese Aff.  (Dkt.  No.  41-7) ¶ 66. Following that complaint, plaintiff was prescribed an analgesic balm and was scheduled to see a doctor two days later.  *Id.*  During that consultation with Dr. Forte on August 23, 2001, however, plaintiff focused on his shoulder and eye problems, and did not mention his right knee

21

pain. *Id.,* ¶ 67.

The record also reflects that in December of 2001, Dr. Forte ordered a series of x-rays of plaintiff's right knee, leading to a diagnosis of mild degenerative right knee joint disease.  Genovese Aff.  (Dkt.  No.  41-7) ¶¶ 69-70.  That condition was treated with a variety of NASIDs, muscle relaxants and pain relievers.  *Id.*, ¶ 71.  Plaintiff's complaints thereafter regarding right knee pain were sporadic, and similar treatment was administered, as needed.  *Id.*, ¶¶ 72-74.

On December 29, 2004 plaintiff complained to Dr. Genovese of swelling, "stabbing pain" and the inability to bend his right knee. Genovese Aff. (Dkt. No. 41-7) ¶ 75 and Exh. 6.  Plaintiff was thereafter scheduled for an MRI, which was conducted on January 27, 2005.  *Id.* ¶¶ 76-77 and Exhs. 6, 7.  The MRI revealed a right meniscus tear.  *Id.* Plaintiff was referred to an orthopedist who, during a consultation held on March 8, 2005, recommended that plaintiff undergo arthroscopic surgery on his right knee.  *Id.* ¶ 78.  While surgery was subsequently scheduled for May of 2005, plaintiff refused to be admitted into the infirmary and undergo the recommended operation.  *Id.* ¶ 79 and Exh. 7.  After discussions with Dr. Genovese regarding the refusal, and a second

refusal on June 2, 2005, the surgery was rescheduled and successfully completed on January 13, 2006. *Id.* ¶¶ 80-83 and Exhs. 7 and 8. Following surgery plaintiff received rehabilitation services, including thirteen sessions of physical therapy between February 14, 2006 and April 6, 2006, to improve his knee condition. *Id.* ¶ 84.

Given these facts, no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's right knee condition.

### e)    Right Eye/Contact Lenses

Plaintiff, who is completely blind in his left eye, claims to have suffered vision loss in his right eye between March of 2003 and October, 2004, and that, despite informing Dr. Forte of this condition, he was "made to wait several weeks before being sent out for PDT Laser Surgery to repair a detached retina and some ruptured blood vessels in his right eye." Complaint (Dkt. No. 1) ¶ 6(5).

Plaintiff's medical records reveal that on March 4, 2003 he visited the medical facility at Shawangunk, complaining of difficulties with his right eye, and was promptly examined. Genovese Aff. (Dkt. No. 41-7) ¶ 88 and Exh. 5. Plaintiff was subsequently seen by an opthomologist on March 12, 2003, at which time he was diagnosed as suffering from a detached

retina.  *Id.* ¶ 89 and Exh. 5.  Surgery to repair the damage to plaintiff's right eye was subsequently performed on March 8, 2003.  *Id.* ¶ 90 and Exh. 5.  According to plaintiff's records, following the surgery he returned to the opthomologist for a follow-up procedure, referred to as "photdynamic therapy," and thereafter was seen at eleven additional visits through October 8, 2004.  *Id.* ¶¶ 91-92 and Exh. 5.  Plaintiff's medical records also reveal that he was provided new contact lenses at some time prior to June 10, 2005.  *Id.* ¶ 96 and Exh. 11.

In sum, as the foregoing reflects, the record fails to support plaintiff's claim of defendants' deliberate indifference to his medical conditions and, on the contrary, reveals patterns of intense efforts to treat his various medical conditions.  Accordingly, I recommend dismissal of plaintiff's Eighth Amendment deliberate indifference claims.

> E.   Plaintiff's ADA and Rehabilitation Act Claims

In addition to asserting claims under the Eighth Amendment plaintiff's complaint, including in his fifth through ninth causes of action, alleges that by their conduct defendants violated the ADA and section 504 of the Rehabilitation Act.  In their motion, defendants maintain that because neither of those provisions allows for suits against individuals,

24

plaintiff's ADA and section 504 claims are subject to dismissal.

Analysis of plaintiff's claims against defendants, who it should be recalled are sued both as individuals and in their official capacities, is not as straightforward as defendants seemingly suggest. The application of the immunity which the Eleventh Amendment affords to defendants sued in both their individual and official capacities under those provisions is complex, and differs greatly depending upon which is being applied.

1.   Individual Capacities

To the extent that plaintiff's claims against defendants are viewed as having been brought in their individual capacities, defendants are correct in their assertion that neither Title II of the ADA nor section 504 of the Rehabilitation Act provides for individual capacity suits against state officials. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); *Shariff v. Coombe*, No. 96 Civ. 3001, 2002 WL 1392164, at *2 (S.D.N.Y. June 26, 2002) (Jones, J.) (citing *Garcia*, 280 F.3d at 107). Accordingly, there is no legal basis for plaintiff's ADA and Rehabilitation Act claims against defendants in their individual capacities, and those claims are therefore subject to dismissal.

2.    Official Capacities

Consideration of whether plaintiff may also bring an action under the ADA and section 504 against defendants in their official capacities presents a far more challenging issue, and those claims are not easily discounted.   While in *Henrietta D. v. Bloomberg* the Second Circuit held that an ADA plaintiff can assert a prospective claim for injunctive relief under *Ex Parte Young* against a state official in his or her official capacity, as opposed to against the state directly, it has not explicitly held likewise for ADA plaintiffs who seek damages. 331 F.3d 261, 287 (2d Cir. 2003) (*citing Ex Parte Young*, 209 U.S. 123, 155-156, 28 S. Ct. 441, 452 (1908)). Nonetheless, as defendants argue, seeking monetary damages from DOCS officials in their official capacities, as plaintiff does in this instance, is the functional equivalent of seeking damages directly from the State of New York, and Eleventh Amendment sovereign immunity therefore ordinarily protects a defendant in his or her official capacity to the same extent that it protects the State.  *See*, *e.g.*, *Garcia*, 280 F.3d at 107 (citing, *inter alia*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)).

It is well settled under Eleventh Amendment jurisprudence that

26

neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity.  *See*, *e.g.*, *Kilcullen v. N.Y. State Dep't of Labor*, 205 F.3d 77, 79 (2d Cir. 2000), *implicitly overruled on other grounds by Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 368, 121 S.Ct. 955, 965 (2001); *Hallett v. N.Y. State DOCS*, 109 F. Supp.2d 190, 197 (S.D.N.Y. 2000) (citations omitted).  In this respect, the Eleventh Amendment, while not directly controlling, confirms the broader, "'background principle of sovereign immunity[.]'"  *Garcia*, 280 F.3d at 107 (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72, 116 S. Ct. 1114, 1131 (1996)).  When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of constitutional authority.  *Garrett*, 531 U.S. at 363, 121 S.Ct. at 962 (citing, *inter alia*, *Seminole Tribe*, 517 U.S. at 72-73, 116 S.Ct. at 1122); *Garcia*, 280 F.3d at 108 (citations omitted).  The pivotal question, in determining whether the defendants are entitled to protection under the Eleventh Amendment when sued for damages in their official capacities, is whether, and if so to what extent, that amendment protects the states from liability under Title II of the ADA and section 504 of the Rehabilitation

Act.[6]

a)   <u>The ADA and the Eleventh Amendment</u>

The question of whether the Eleventh Amendment bars ADA claims

under Title II against a state is an unsettled question among the circuits.

In *Garrett*, the Supreme Court held that Congress had failed to validly

abrogate state sovereign immunity under Title I of the ADA.  531 U.S. at

374, 121 S. Ct. at 967-68.  In doing so, the Court was careful to

distinguish Title II from its analysis, inasmuch as the issue had not been

briefed by the parties, but did note that the remedial scheme of Title II is

very different from that of Title I.  *Id.* at 360 n.1, 121 S. Ct. at 960 n.1.  The

courts appear to be divided as to whether *Garrett* should extend to Title II

of the ADA, especially since *Pennsylvania Department of Corrections v.*

*Yeskey* – which held that Title II of the ADA applies to prisons – had been

decided in the term previous to *Garrett*, but did not address sovereign

immunity. 524 U.S. 206, 118 S. Ct. 1952 (1998); *compare*, *e.g.*, *Popovich*

*v. Cuyahoga Cty. Ct. of Common Pleas*, 276 F.3d 808, 813-16 (6th Cir.

2002) (holding that sovereign immunity validly abrogated by Congress as

---

[6]        In performing my analysis I have assumed, without deciding, that
plaintiff's failure to include the State and/or the DOCS as a named defendant is not
fatal to his claims.

28

to the Due Process Clause), *cert. denied*, 537 U.S. 812, 123 S. Ct. 72 (2002), with *Alsbrook*, 184 F.3d at 1007 (finding that Congress exceeded authority by extending Title II of the ADA to the states and therefore did not validly abrogate sovereign immunity).

The Second Circuit has taken a slightly different approach than various other federal courts in addressing this question.  In *Muller v. Costello*, decided by the Second Circuit before the Supreme Court issued its opinion in *Garrett*, the Second Circuit found that Congress had validly abrogated sovereign immunity within its authority under section five of the Fourteenth Amendment, subjecting states to potential monetary liability under the ADA.[7] 187 F.3d 298, 311 (2d Cir. 1999).  More recently, however, in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, the Second Circuit found that *Garrett* had "implicitly abrogated" its prior position that the states were not immune from ADA claims.  280 F.3d at 113 n.3.  In *Garcia*, the Second Circuit found that Congress could not validly abrogate sovereign immunity under the Commerce Clause, one of the two empowering provisions cited in support of its enactment of Title II. *Garcia*, 280 F.3d at 98.  The circuit court went on to find, however, that

---

[7]       That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. Const. amend XIV, § 5.

Congress could exercise its authority under section five of the Fourteenth

Amendment – the "sweep of congressional authority" allowing Congress

to "enforce the [F]ourteenth [A]mendment and to regulate commerce, in

order to address the major areas of discrimination faced day-to-day by

people with disabilities" – when enacting Title II of the ADA, as a whole,

though it found the power to have been exceeded through enactment of

Title II, since that provision conferred upon Congress the right to abrogate

sovereign immunity and allow for private parties to sue nonconsenting

states for money damages. *Garcia*, 280 F.3d at 108-10.

Turning to the specific question of whether Congress, through

proper invocation of its section five powers, effectively abrogated

sovereign immunity in the case of private damage suits under Title II,

however, the Second Circuit found that the ADA's broad remedial

scheme, borrowed from the Rehabilitation Act and Title VI of the Civil

Rights Act of 1964, included a judicially implied private cause of action,

thus allowing that court latitude to shape a remedy.  *Id.* at 110-12.

Specifically, the Second Circuit concluded in *Garcia* that Title II claims

against the states for monetary damages could be reconciled with the

prohibitions of the Eleventh Amendment if permitted in limited

circumstances – in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability.[8] *Garcia*, 280 F.3d at 111; *see Doe v. Goord*, No. 04-CV-0570, 2004 WL 2829876, at *15 (S.D.N.Y. Dec. 10, 2004) (Peck, C.M.J.).

b)      The Rehabilitation Act and the Eleventh Amendment

As to the viability of plaintiff's section 504 claims against the defendants in their official capacities, once again *Garcia* is instructive on the issue.  Before *Garrett*, the Second Circuit had extended its logic in *Muller*, in which it held that Congress had validly abrogated sovereign immunity under the ADA, to claims under section 504 of the Rehabilitation Act.  *Kilcullen*, 205 F.3d at 78.  In *Garcia*, however, the Second Circuit held that as with Title II of the ADA Congress exceeded its power under section five of the Fourteenth Amendment. *Garcia*, 280 F.3d at 113. Since, unlike the ADA, section 504 was enacted under the Constitution's Spending Clause, however, the *Garcia* court held that despite Congress's failure to properly abrogate Eleventh Amendment immunity by statute Congress could still require a state to agree to waive its sovereign

---

[8]      The Second Circuit reaffirmed this position in *Henrietta D.*, noting that the two decisions were consistent.  331 F.3d at 268.

immunity as a condition of accepting federal funds. *Garcia*, 280 F.3d at

113. While acknowledging that Congress imposed such a condition in

Title 42 (42 U.S.C. § 2000d-7), the court also noted that the state's

waiver, as with any waiver, must have represented an "intentional

relinquishment or abandonment of a *known* right or privilege." *Garcia*, 280

F.3d at 114 (emphasis in original) (quotation omitted). Applying this

standard, the *Garcia* court was unable to conclude that New York had

knowingly waived its sovereign immunity when it accepted federal funds,

since at the time when the state accepted federal funds Title II of the ADA

was reasonably understood to validly abrogate sovereign immunity under

the Commerce Clause, thereby allowing suit under the ADA and section

504 against the state. *Id.* (citing, *inter alia*, *Kilcullen*, 205 F.3d at 82).

Courts in this circuit have differed, however, as to what date the

State can be deemed to have understood that the DOCS acceptance of

federal funds would create potential section 504 liability for them to which

they were not already subject. While some courts have held that the state

effectively waived its sovereign immunity as of September 25, 2001, when

*Garcia* was decided, others have held that the waiver occurred as early as

32

February 25, 2001, when the Supreme Court decided *Garrett*.[9]  *See Doe*,

2004 WL 2829876, at *16 (noting split and collecting cases).  In this

instance the debate is academic, since the conduct forming the basis for

plaintiff's claims of violation of his rights as a disabled person – the

prison's failure to timely treat his eye condition and to provide him with

contact lenses – did not begin until March 2003.  Complaint (Dkt. No. 1) ¶

6(5).  Because those occurrences were well after issuance of both the

*Garrett* and *Garcia* decisions, I conclude that plaintiff's action against

defendants under section 504 of the Rehabilitation Act in their official

capacities cannot be barred by Eleventh Amendment immunity.

Since defendants' only challenge to plaintiff's ADA and Section 504

claims is focused upon the issue of whether they may be sued, either

individually or in their official capacities, under section 504 and the ADA,

and their motion has not called into question the merits of those claims,

for now plaintiff's ADA and section 504 causes of action against

defendants in their official capacities must survive.  Having reviewed

_____

[9]      One court has even suggested, in dicta, that arguably sovereign immunity could have been waived as early as April 17, 2000, when the Supreme Court granted *certiorari* in *Garrett*.  *Wasser v. New York State Office of Voc. & Educ. Servs. for Indivs. with Disabilities*, No. 01-CV-6788, 2003 WL 22284576, at *10 (E.D.N.Y. Sept. 30, 2003) (Trager, J.).

plaintiff's complaint and the record submitted in connection with the pending motion, it appears to the court that those causes of action may well ultimately prove to be legally deficient.  I am disinclined, however, to *sua sponte* recommend that the court address the merits of plaintiff's claims when defendants' motion did not place him on notice of any such challenge.  I do recommend, however, in light of this observation, that defendants be given a further opportunity to interpose a summary judgment motion attacking the remaining claims in the action.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint challenges the quality of medical treatment that he received for several medical conditions over a period of time while confined at Shawangunk.  Based upon the record now before the court, which includes extensive information detailing the medical attention provided by defendants for each of those conditions, no reasonable factfinder could conclude that defendants did not afford plaintiff the minimal, constitutionally–mandated medical treatment for his conditions.  I therefore recommend dismissal of plaintiff's Eighth Amendment deliberate indifference claims as a matter of law.

In their motion defendants also properly assert their entitlement to

immunity from suit to the extent that plaintiff has asserted Eighth

Amendment claims against them in their official capacities, and those

claims are subject to dismissal.  Similarly, plaintiff's ADA and section 504

claims against defendants in their individual capacities are subject to

dismissal because those legislative provisions afford no private right of

suits for damages against individuals.  Plaintiff's ADA and section 504

claims against the defendants in their official capacities, however, are not

precluded by the Eleventh Amendment, and to that extent plaintiff's

complaint should survive defendants' motion.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 41) be GRANTED, in part, and that all of plaintiff's claims

against the defendants be DISMISSED with the exception of plaintiff's

causes of action against defendants in their official capacities for violation

of the ADA and Section 504 of the Rehabilitation Act, with leave to

defendants to move for summary judgment addressing the merits of those

claims.[10]

---

[10]    In light of this recommendation I have not addressed defendants' additional claim of entitled to qualified immunity which, I note, would not shield them from liability in connection with plaintiff's section 504 and ADA claims in their official capacities.  *Kentucky v. Graham*, 473 U.S. at 167, 105 S.Ct. at 3105-06.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the court within TEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993). It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

Dated:     August 21, 2009
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

36